### COQUILLARD's Administrators *v.* FRENCH.

Claims on account, held against certain *Indian* tribes, in 1847, and which were expected to be paid by the government of the *United*

*States*, were assignable, in equity, so as to enable the assignee, who was the real party in interest, to maintain suits thereon in his own name.

A paragraph of an answer, which sets up in bar of an action upon an agreement, a new agreement between the parties, which does not appear to have been executed, and was a mere accord without satisfaction, is bad on demurrer.

A paragraph of an answer, which pleads no facts that can not be given in evidence under the general denial, the latter having been pleaded, should be stricken from the files on motion.

An authority " to attend to the business of the principal generally," or " to act for him with reference to all his business," does not authorize the agent to sell real estate, nor does it allow him to sell, or otherwise dispose of the personalty of his principal, unless as a means, necessary and proper, to conduct the business to which the agency applies.

APPEAL from the *St. Joseph* Circuit Court.

DAVISON, J.—This was an action by *French* against *Samuel Cotterell*, administrator of *Alexis Coquillard*, deceased, commenced in the *St. Joseph* Common Pleas, and after its commencement, duly certified to the Circuit Court. The complaint contains four counts. The first is founded upon an account, setting forth the items, and amounting, in the aggregate, to five hundred and forty-four dollars and fifty-five cents. The second alleges that *Coquillard*, while in life, was indebted to the plaintiff, twenty thousand dollars, which is due, and remains unpaid. And the third count is upon a written agreement, alleged to have been executed by *Coquillard*, in his lifetime, to the plaintiff; it bears date March 3, 1847, and reads thus:

" Know all men by these presents, that I, *Alexis Coquillard*, for and in consideration of ten thousand three hundred and twelve dollars, to me in hand paid by *Ezekiel French*, the receipt whereof is hereby acknowledged, and in consideration of his having executed his promissory note to me for

six thousand three hundred and ninety-four dollars, payable when the claims hereinafter mentioned are collected, and, furthermore, it is upon the express agreement, that *French* is to retain and have out of such claims, the first moneys after expenses of collection are paid, enough to reimburse himself the said ten thousand three hundred and twelve dollars, and the next moneys received on such claims, are to be received by me, after deducting necessary expenses of collection, enough to make up an equal sum, to-wit: Ten thousand three hundred and twelve dollars, and after that, the receipts of moneys are to be equally divided between myself and *French.* I am to pay, in the end, all expenses of collection, except traveling expenses, which are to be equally borne between myself and *French;* have bargained, sold, and do hereby assign and transfer, the one undivided half of all my right, title and interest, in and to the *Indian* claims against the *Pottawattamie, Ottawa,* and *Chippeway* nations of *Indians,* a schedule of which claims is hereto attached, and which claims are now on file at the proper office at the seat of government of the *United States,* and were all, except one of them, allowed by *William B. Mitchell,* commissioner on such claims, on behalf of the government, in the year 1840, and which claims I hold by transfer and powers of attorney; upon express agreement, that such sale, assignment, and transfer is made to *French,* without any recourse upon me, in any event whatever; and I do hereby nominate, authorize, and appoint *Ezekiel French,* my lawful attorney, for me, and in my name, or otherwise, to demand, collect, receive, sell, transfer, assign, or dispose of, in any manner soever, and discharge and receipt for said undivided half of said claims, to said government, or said *Indians,* entirely and perfectly, as I could do in person, were I individually and personally present at the doing thereof, at his own will and pleasure, freely; but in all and every case, without any recourse upon me, in any event whatever.

Hereby ratifying and confirming whatsoever my said attorney shall do in the premises, I hereunto set my hand and seal, this third day of March, 1847.

"In presence of } "A. Coquillard, [*seal.*]"
 "R. L. Farnsworth, }
 "John Grant." }

The following is a copy of the schedule of claims referred to in the above agreement, to wit: "Schedule of claims against the *Pottawattamie, Ottawa,* and *Chippeway* tribes of *Indians,* belonging to *Alexis Coquillard.*

"No. 2 A. T. Hatch, - - - - $874 58
 8 Jacob Hardman, M. D. (medical services
      in 1840), - - - - 54 00
 13 Francis Monton, - - - 1099 54
 14 H. H. Wheeler, for use of Mary Chapotine, 1136 13
 15 John M. Barbour, - - - 1000 00
 20 Pierre F. Navarre, - - 2523 37
 17 Celeste Sharron, - - - 1000 00
 21 Lewis St. Comb, - - - 735 00
 22 John B. Rulo, - - - 974 50
 24 Jane Rulo, heir of Thomas Jones, 1000 00
 26 Lambert McComb, - - - 63 00
 37 Christian Holler, - - - 60 00
 38 Jacob Cripe, - - - - 559 50
 39 John Cripe, - - - 300 00
 40 Pleasant Ireland, - - - 100 00
 42 Jonathan A. Liston, horse, saddle and
      bridle, 1840, - - - 100 00
 43 Samuel Street, - - - 71 93
 56 George Busha, boarding Indians at Council, 1840, - - - 322 18
 57 Jonathan A. Liston, - - - 265 00
 75 W. G. Knaggs, - - - 70 00
 79 Charles Lucie, - - - 71 00

Coquillard's Administrators *v.* French.

"No.  89  Rhinehart Cripe,  -       -       -     $570 00.
    90  E. V. Cecott, -      -      -      -      100 00
   140  J. A. Henricks,   -      -      -      150 00
   143  Mary L. Chaudonai, -      -      -      439 18
   150  Elmer Rose, (horses, etc., in 1840),    273 00
   156  John Pike,    -      -      -      -      250 00
   157  E. D. Woodbridge,      -      -      250 00
   159  Leonard B. Rush,    -      -      -      79 00
   160  Samuel L. Cottrell,      -      -      415 00
   161  L. M. Alverson, (goods furnished in 1840), 4379 45
   163  A. Coquillard,      -      -      -      270 00
   193  Martin & Finley,      -      -      -      55 00
   194  C. W. Martin,    -      -      -      141 00
   210  William B. Mitchell, (horses, saddle, etc.,
            in 1840),      -      -      -      365 25
   223  Louis Cowpeau, (goods in 1840),    -      766 68
   246  Francis Monton, -      -      -      24 00
   254  Daniel Wagner,      -      -      -      200 00
   255  A. Coquillard, (goods, horses, saddles,
            etc., 1840),      -      -      -      3662 51
   256  J. A. Liston,    -      -      -      500 00
    76  E. Ballenger,      -      -      -      43 20
   195  S. A. Bernier,    -      -      -      600 00
   176  A. R. & J. H. Harper, (goods in 1840),  1090 03
   199    "      "      "      "      "      105 10
   240    "      "      "      "      "      194 64
   135  G. Boleiske, (medical services in 1840),    25 00
    87  Rex & Willoughby, (medical services in
            1840),    -      -      -      -      50 00
   366  Joseph Bertrand,      -      -      5229 29
   164  Elisha Egbert, (goods in 1840),    -      757 08 "
                                          ―――――――――
                                          $33414 14

It is averred that said claims, in the aggregate, amount to thirty-three thousand four hundred and fourteen dollars

and fourteen cents, the one-half of which, viz.: sixteen thousand seven hundred and seven dollars and seven cents, *Coquillard*, by the aforesaid agreement, sold, assigned, and transferred to the plaintiff; that, afterward, in the year 1849, the plaintiff took a journey to *California*, and did not return to *Indiana* until January the 25th, 1851; that during plaintiff's absence, *Coquillard*, by fraud and tortious means, etc., obtained, from one *Lemuel White*, the possession of the above agreement, without the authority, consent, or knowledge of the plaintiff; and that neither the decedent, nor his administrator, have ever returned it; but that he, *Coquillard*, fraudulently mutilated the same by cutting out his signature and certain words and letters therefrom; that the plaintiff has duly performed all the conditions of the agreement on his part, to be performed; but *Coquillard* failed to perform the conditions on his part; that the government of the United States paid the claims set forth in the schedule, and of the moneys thereof, *Coquillard*, in his lifetime, received twenty-five thousand dollars, after deducting and paying the expenses of collecting; and that he, in his lifetime, although requested, and said administrator, since his death, although requested, have hitherto failed and refused to pay the plaintiff the said sum of ten thousand three hundred and twelve dollars, or any part thereof; which amount is due, and as yet remains unpaid, beside seven years' interest thereon, wherefore the plaintiff demands judgment, etc.

The fourth count is founded upon the same written agreement, and alleges, substantially, the following breaches:

1. That *Coquillard*, in his lifetime, collected on the claims, in said schedule specified, twenty-six thousand five hundred and fifty-nine dollars, which, after deducting expenses of collection, amounted to more than ten thousand three hundred and twelve dollars, and which last-named sum being of the first moneys received on the claims, belonged exclusively, to the plaintiff; but the same and every part, was, and has

been, wrongfully withheld and retained from him, by *Co-quillard*, in his lifetime, and his administrator since his death. 2. That *Coquillard*, in his lifetime, collected and received into his hands, the entire amount of said claims, to-wit: thirty-three thousand four hundred and fourteen dollars and fourteen cents, and converted the same to his own use; and ever since, *Coquillard*, during his life, and said administrator since his death, have refused to account with the plaintiff, and pay over to him a moiety of said moneys, after deducting expenses of collection, etc. 3. That the entire amount of said claims, to-wit: thirty-three thousand four hundred and fourteen dollars and fourteen cents, was paid by the *United States Government*, in the Government's independent treasury drafts, payable in the city of *New York;* that these drafts were all received by *Coquillard*, in his lifetime, at *South Bend, Indiana*, and were worth at that place, when received, two per cent. above par; and that one-half the amount of said drafts, with the above premium thereon, amounting in the whole to seventeen thousand dollars, belonged to the plaintiff, there being no traveling expenses; was received by *Coquillard*, for the use of the plaintiff; was due from him, while in life, to the plaintiff; and still remains due and unpaid. 4. The same as the third, with the additional averment of a demand on *Coquillard*, in his lifetime, for one-half the amount of the drafts, with said premium thereon, and his refusal to pay, etc. 5. That *Coquillard*, on the 6th of October, 1852, being then in life, promised to pay to the plaintiff one-half the amount of the drafts, with interest thereon, but the same has not been paid. 6. That *Coquillard*, having obtained the written agreement by fraud, as aforesaid, fraudulently disposed of the plaintiff's interest in said claims, which interest was, and has been, thereby lost to the plaintiff, whereby he has been and is damaged twenty thousand dollars.

Defendant demurred to the third and fourth counts of

the complaint, but his demurrers were overruled; and thereupon he answered by nine paragraphs: The first is upon a book account, consisting of various items of account, which, in the whole, amount to two thousand four hundred and fourteen dollars and eighty-seven cents. The second alleges, by way of set-off, a note, bearing date December 31, 1852, for three thousand two hundred and eighty-four dollars, payable in two years, with interest, upon which there is indorsed a credit, July 11, 1854, two thousand two hundred and thirty-one dollars. The third alleges, by way of set-off, a note, of the same date as above, for three thousand two hundred and ninety dollars, payable in three years, with interest. The fourth is the general denial. The fifth alleges payment. And the sixth, seventh, eighth and ninth paragraphs are thus copied, substantially, in the appellant's brief:

"6. The sixth paragraph set up specially, that after the execution of the agreement and schedule set forth in the complaint, *French*, in the year 1849, went to *California*, and prior to his departure, by power of attorney, constituted one *Lemuel B. White* his general agent, to transact all his (*French's*) business; and that, afterward, on the 25th day of April, 1850, the said *White*, being the duly authorized agent of *French*, sold to *Coquillard* all the claim, right, title and interest of *French*, to the *Indian* claims embraced in the schedule, for five thousand dollars, in *Illinois* State bonds, and that *White*, as agent of *French*, delivered to *Coquillard* for cancellation the original power of attorney and agreement (heretofore copied at large), and that the said agreement was thereupon canceled; that *Coquillard* executed his note to *French*, for the payment of the five thousand dollars of *Illinois* State bonds, and delivered the same to *White*, which note, defendant alleges, is still in the possession of *French*; that, afterward, on the 11th of June, 1850, *Coquillard* paid to *White* two thousand dollars in *Illinois* State bonds; that, afterward, on the return of *French* from *California*, on the

25th day of February, 1851, he ratified and confirmed the acts of his agent, *White,* and received three thousand dollars, in *Illinois* State bonds, from *Coquillard,* in full satisfaction of the note.

" 7. The seventh paragraph denies the execution of the agreement set up in the plaintiff's complaint, but admits the execution of one in every respect identical, excepting only the provision respecting the payment of the expenses of the collection of the claims, and alleges that the sale by *Coquillard* was made without any recourse upon him in any event whatever; and that at the time of the execution of the instrument, no provision or appropriation of any kind or nature whatsoever had been made by the government of the *United States* for the payment of said *Indian* claims. It further alleges the appointment of *Lemuel B. White* as agent, the re-sale of claims by *White,* as such agent, to *Coquillard,* substantially as in the sixth paragraph. It alleges also that this re-sale was made before the appropriation by government of money to pay the claims, and that *Coquillard* delivered to *White,* at the time of re-sale, the note of *French* for six thousand three hundred and ninety-four dollars and fifty-seven cents, payable when said claims were collected; that the original agreement was delivered by *White* to *Coquillard* for cancellation; that thereupon *Coquillard* cut from said instrument his signature, whereby the erasures now in the original were made; that *Coquillard* paid two thousand dollars, in *Illinois* State bonds, to *White; that French,* while in *California,* was informed, by his agent, of the re-sale of the claims to *Coquillard,* and ratified the acts of his agent, and upon his return again ratified the same.

" 8. The eighth paragraph refers to the agreement between *White* and *Coquillard* in relation to the sale of *French's* interest in the claims, as set forth in the fourth original paragraph of the answer, now numbered seventh in the record; and alleges, that *French* having hypothecated the *Illinois*

State bonds taken by *White* from *Coquillard,* it was afterward, in February, 1851, agreed, between *French* and *Coquillard,* that *Coquillard* would, upon the return of the two *Illinois* State bonds of one thousand dollars each, and of the note for five thousand dollars in *Illinois* State bonds, pay to *French* five thousand dollars in money, in lieu of the bonds and note ; and alleges that plaintiff still retains the possession of the bonds, and note of five thousand dollars, and also the note for six thousand three hundred and ninety-four dollars and fifty-seven cents, and has never offered to return them; and that the decedent, in his lifetime, and his administrator, since his death, have ever been ready and willing to pay said money, upon plaintiff's compliance with his agreement.

" 9. The ninth paragraph alleges that the decedent never received any money or moneys upon the powers of attorney and transfers mentioned in the agreement or power of attorney executed by *Coquillard;* and that the powers of attorney and transfers made and executed by the original claimants, set forth in the power of attorney made by *Coquillard* upon the 3d day of March, 1847, were executed after the passage of the Act of Congress of July 29, 1846, and entitled 'An Act in relation to the payment of claims,' and prior to the Act of Congress of September 30, 1851, appropriating money for the payment of said *Indian* claims, and that said powers of attorney and transfers were afterward declared, by the proper officers of the government of the *United States,* void and worthless, and all acts done by virtue thereof of none effect; and that by reason of such illegality, *Coquillard* had no right, title, and interest. in the claims mentioned in the complaint; and all said claims, transfers, and powers of attorney were valueless and uncollectable, and that no money was collected upon such claims, by *Coquillard,* upon such powers of attorney and transfers, but the moneys were drawn and collected from the treasury of the *United Statss,* some

by sundry persons other than *Coquillard*, as attorneys of the original claimants, upon new powers of attorney, executed after the said act of appropriation was passed, and some by the claimants themselves, for their own use, and denies that *Coquillard* received any of the moneys for himself, and to his own use."

Issues were made on the first, second, third, fifth, sixth, and seventh paragraphs of the answer. To the eighth, a demurrer was sustained, and the ninth was stricken out on motion. The issues were submitted to a jury, who found, for the plaintiff, seven thousand two hundred and ninety-four dollars. Motion for a new trial denied, and judgment, etc.

Against the validity of the third and fourth counts of the complaint, it is insisted that the claims therein set forth are not assignable; that they are choses in action, and the assignment of them, being against public policy, is consequently void. In support of this position, we are referred to an Act of Congress, approved July 29, 1846. But that enactment does not apply to the point under discussion, because it relates to claims against the government, while the claims in question are against the *Indians*. 9 U. S. Stat. at Large, p. 41. We know of no reason or authority why the assignment of these claims should be held illegal. They are, it is true, choses in action, and may not, at common law, have been assignable, so as to enable the assignee to sue in his own name; but in equity, the assignee being the real party in interest, was the proper party to avail himself of the remedy. Van Santvoord's Pl. 108. Perkin's Pr. 131. 11 Ind. 199. 12 *Id.* 241.

The ruling upon the demurrer to the eighth defense is next to be considered. That defense, as we have seen, sets up a new agreement between *Coquillard* and *French*, after the latter returned from *California*, in discharge of a former executed agreement between *White*, as the alleged agent of

*French,* and *Coquillard;* but the new agreement does not appear to have been executed; was a mere accord without satisfaction; and was not, therefore, an available bar to the action. Nor did the Court err in striking out the ninth defense; because all the facts which it contains could have been given in evidence under the general denial.

The causes for a new trial are thus assigned: "1. Error in the assessment of damages; the same being too large. 2. The verdict is unsustained by the evidence. 3. Error of the Court in instructing the jury, that, if they found for the plaintiff, they may allow interest on the ten thousand three hundred and twelve dollars, received by *Coquillard,* on the *Indian* claims, from the time the drafts came into his hands. 4. Error of law, in instructing that *French's* power of attorney to *White,* and *French's* letter to *Coquillard,* did not give *White* authority to sell said claims to *Coquillard.*"

The evidence is upon the record. It tends to prove that plaintiff, after the execution of the agreement recited in the complaint, viz.: in April, 1849, went, by overland route, to *California,* and returned in January, 1851; and that, when he started for *California,* he gave to one *Lemuel B. White,* a power of attorney, in these words:

"Know all men, etc., that We, *Ezekiel French* and *Elizabeth French,* his wife, do hereby constitute and appoint *Lemuel B. White,* of *Kosciusko* county, *Indiana,* our attorney, for us, and in our names, to sell and convey, by deed in fee simple, for such price, and upon such terms of credit, and to such person, or persons, as he shall think fit, the whole, or any part, of any and all lots in the town of *Oswego,* in said county; a plat of said lots, so to be sold, is now of record in the recorder's office of the same county, as laid out by *Ezekiel French* and *Rowland Willard;* also, to lease, sell, or convey, our interest in the water-power adjoining *Oswego;* also, to lease, or sell, our house and lot in *Oswego,* and the

lands on the west side of the river, near *Oswego, and to attend to our business generally;* hereby ratifying, etc., all such bargains, receipts for money, agreements, and deeds, as shall be made, executed, or acknowledged, in the premises, by our said attorney, the same as if we were personally present, and the same done by ourselves.   In testimony whereof, we have hereunto set our hands and seals, at *Oswego,* this 2d of April, 1849.      "EZEKIEL FRENCH,   [*seal.*]

"ELIZABETH FRENCH. [*seal.*]"

The foregoing warrant of attorney appears to have been duly acknowledged and duly recorded.

The evidence, also, tended to prove, that *White,* professing to act under the above instrument, on the 25th of April, 1850, and during the plaintiff's absence, sold and transferred all his, plaintiff's, interest in said *Indian* claims, to *Coquillard,* receiving therefor *Coquillard's* promissory note for five thousand dollars, payable to the plaintiff in five one thousand dollar *Illinois* State bonds; and *White,* in pursuance of this sale, delivered up the agreement, set out in the complaint, to *Coquillard,* who cut his name from it.   And further, there was in evidence, a letter to plaintiff, from *Coquillard,* dated *West Port,* May 30, 1849, in which the plaintiff says, *inter alia,* "I learn, from *G. W. Ewing,* and others, that there is a prospect of having the recent *Miami* and *Pottawattamie* claims allowed by the *Indian* department, through the influence of the Secretary of War. * * * I have not heard a word from our *Pottawattamie* claims of 1840.   I suppose all is being done that can be done on part of the claimants to have them promptly and fairly attended to.   As I have perfect confidence in your judgment and experience, and perseverance, I have no plan to suggest.   I think the present a favorable time to push the claims. *I have fully authorized L. B. White, of Oswego, to act for me, with reference to all my business.*   You will find him an efficient and clever fellow.

You will correspond with him, and give him the state of things, and instruct him what to do on my part."

In reference to the power of attorney and letter, to which we have just referred, the Court thus instructed the jury: "The power of attorney, given in evidence, and the letter of *French*, dated May 30, 1849, did not, *per se*, confer upon *White* the authority to cancel and give up the agreement set out in the complaint."

Against the instruction, thus given, it is insisted, "that the terms of the letter and power of attorney, grant power unlimited, embracing the whole business of the principal, and a resort to ordinary and usual methods or means comes within the scope of the power." This proposition, as we understand it, is not strictly correct. An authority "to attend to the business of the principal, generally," or "to act for him, with reference to all his business," does not authorize the agent to sell and convey real estate; nor does it allow him to sell, or otherwise dispose of, the personalty of his principal, unless as a means, necessary and proper, to conduct the business to which the agency applies. In this case, the agent was, perhaps, authorized, under the power "to attend to the business of the principal," to act in reference to the collection of the *Indian* claims from the government; but, it seems to us, he had no power, for the purpose of collection or otherwise, to sell, or transfer, his principal's title to the claims in question. Such power does not appear to have been in contemplation of the parties, when the warrant of attorney was executed; nor is it, even impliedly, within the scope of the authority conferred by the instrument creating the agency. Story on Agency, sec. 57, *et seq.*

The instruction was, therefore, not objectionable. But, in argument, it is said that the plaintiff, after he returned from *California*, ratified the acts of his agent, in relation to the sale of the claims to *Coquillard*, and the surrendering up to him of the agreement. That was a question for the

jury.   In reference to the point of fact which that question involves, the evidence is voluminous, and we are not inclined to refer to it in detail.   We have, however, carefully examined all the evidence relative to that point, and, though it is to some extent conflicting, the jury, in our opinion, were authorized to say that it failed to prove the alleged ratification.

The third assigned cause for a new trial relates to the following instruction: "If you find for the plaintiff, you must find the interest on the whole amount received by *Coquillard*, even if you should find it to be the whole amount claimed, to wit: ten thousand three hundred and twelve dollars."   As has been seen, the agreement set out in the complaint, stipulates that, out of the first moneys collected upon the *Indian* claims, the plaintiff was to receive the amount just stated, and the evidence very plainly shows that, of these claims, *Coquillard*, assuming that they belonged to him, exclusively, collected a large amount, over and above the amount so stipulated to be paid to the plaintiff.   There is no evidence tending to prove that he ever paid, offered to pay, or intended to pay, the ten thousand three hundred and twelve dollars, or any part of it.   We think the interest contemplated by the instruction was plainly allowable, and that the Court did not, therefore, misdirect the jury.

But it is argued, that the verdict is excessive; that it is unsustained by the evidence.   These positions, in view of all the evidence, are untenable.   It is true, there is an apparent conflict, but the verdict, it seems to us, is not manifestly wrong, either as to the plaintiff's right to recover, or as to the amount recovered.   There are various assignments of error, based upon the rulings of the Court, in reference to the exclusion of evidence offered by the defendant; to the admission of testimony over his objection; and to the giving, and refusal to give, instructions to the jury.   But, as these rulings were not presented to the Court in the motion for a

new trial, the errors referring to them are not available in this Court.

A point is made by the appellant, in his brief, relative to the taxation of costs; but no motion to tax costs appears to have been made in the Circuit Court, nor is there any assignment of error in reference to such taxation. It follows, the point, thus made, is not, properly, before us.

*Per Curiam.*—The judgment is affirmed, with one per cent. damages and costs.

*John F. Miller* and *William G. George*, for the appellants.
*J. A. Liston* and *R. L. Farnsworth*, for the appellee.